NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Yolanda CARITA, | |
| Plaintiff, | |
| v. | Civ. No. 10-2517 |
| MON CHERI BRIDALS, LLC and Stephen LANG, | OPINION |
| Defendants. | |

THOMPSON, U.S.D.J.

This matter has come before the Court on Defendant Mon Cheri Bridals, LLC's ("Mon Cheri") and Defendant Stephen Lang's ("Lang") (collectively, "Defendants") Motion for Summary Judgment [docket # 29] brought pursuant to Federal Rule of Civil Procedure 56. Defendants move for summary judgment on all four counts remaining in this case. These counts include causes of action arising under: (1) the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2611, *et seq.*; (2) the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-2(e); (3) the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1, *et seq.*; and (4) the New Jersey Wage and Hours Law ("Wage Act"), N.J.S.A. 34:11-4.1, *et seq.* Plaintiff Yolanda Carita ("Carita" or "Plaintiff") opposes this motion [31]. The Court has reached a determination after considering the submissions of the parties and without oral argument pursuant to Federal Rule of Civil Procedure 78(b). For the following reasons, judgment will be entered in favor of the Defendants on Plaintiff's FMLA and CEPA claims, but Plaintiff's LAD and Wage Act claims (with some limitations) will be allowed to proceed to trial.

I.      BACKGROUND

Mon Cheri was formed in 1991 and specializes in the sale of dresses made for special occasions.  (Defs.' Statement of Material Facts Not in Dispute ¶ 3).[1]  Defendant Lang is the Chief Executive Officer ("CEO") and majority shareholder of Mon Cheri.  (*Id.* ¶ 4).  Plaintiff, a former minority shareholder and employee of Mon Cheri, was employed with Mon Cheri from September 15, 1995 through January 22, 2010.  (*Id.* ¶¶ 1, 2, 5).  A number of situations arose throughout the course of Plaintiff's employment with Mon Cheri that form the basis for her claims.

First, after initially starting her career at Mon Cheri as an assistant to the Vice President of Operations, Carita eventually was promoted to the position of Director of Sales for the newly created International Sales Division in 1996.  (*Id.* ¶¶ 5, 6).  On February 1, 2007, Lang issued a memorandum that reorganized Mon Cheri's sales force.  (*Id.* ¶ 9).  As part of this reorganization, another sales representative named Brian Egitto ("Egitto") and all other sales representatives in Mon Cheri's bridal division were to report directly to Lang.  (*Id.* ¶ 10).  Plaintiff alleges that as a result of this reorganization Egitto was treated more favorably by being provided access to greater resources and better compensation.  Plaintiff alleges that this disparity between Egitto and herself was based upon sex discrimination.

Next, in February 2008 Plaintiff became concerned that Lang was misappropriating Mon Cheri assets and concealing income from taxing authorities or otherwise using corporate assets for personal purposes.  (*Id.* ¶ 14).  Plaintiff contacted Mukund Krishnaswami ("Krishnaswami"), another shareholder of Mon Cheri, in order to discuss these concerns.  (*Id.* ¶ 15). Krishnaswami then initiated an audit of Mon Cheri, which was to be conducted by SMART Business Advisory

---

[1] The Statement of Material Facts submitted by either Plaintiff or Defendants is cited throughout this opinion only when the cited fact has been admitted by the opposing party.

Consulting and was to have a particular focus on cash transactions.  (*Id.* ¶¶ 16–17).  This audit, however, was never completed.  (*Id.* ¶ 17).

Finally, on November 5, 2009, Plaintiff called in sick and did not report to work.  (*Id.* ¶ 30).  On that same day, Lang sent an email to Plaintiff that was meant to change the scope of Plaintiff's responsibilities so that she would be responsible only for international sales, effective as of January 1, 2010.  (Defs.' Statement of Material Facts Not in Dispute ¶ 32).  This email also called for Plaintiff to draft a business plan on how she intended to build up Mon Cheri's international sales over the course of the next three years.  As part of this new assignment Plaintiff was told that another Mon Cheri employee would "revise a compensation program that will increase your base [salary] and afford you a commission on sales generated internationally." (*Id.* ¶ 3; Hart Decl., Ex. 19).  Four days later, on November 9, 2009, Plaintiff requested leave under the Family Medical Leave Act.  *See* (Hart. Decl., Ex. 20).  This leave was made retroactive to November 5, 2010.  *See* (*id.*).

Plaintiff was not released by her doctor to return to work until January 12, 2010.  (Defs.' Statement of Material Facts Not in Dispute ¶ 35).  During the days of January 13 through January 15, Plaintiff reported to work.  (*Id.*).  The next day, however, January 16, 2010, Plaintiff again fell ill—this time with walking pneumonia—and as a result she was unable to return to work again until January 22, 2010.  (*Id.* ¶ 36).  Although Plaintiff returned to work on January 22, 2010, she never returned after that date.  (*Id.* ¶ 39).  Plaintiff was paid her base salary and commissions through December of 2009.  (Hart Decl., Ex. 27, II, 11:10–12).  After leaving Mon Cheri, however, Plaintiff alleges that she never received commissions earned during January of 2010.  (Hart Decl., Ex. 27, II, 11:13–15).

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In deciding a motion for summary judgment, a district court considers the facts drawn from "the pleadings, the discovery and disclosure materials, and any affidavits" and must "view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion." Fed. R. Civ. P. 56(c); *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002) (internal quotations omitted).  In resolving a motion for summary judgment, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986).  More precisely, summary judgment should be granted if the evidence available would not support a jury verdict in favor of the nonmoving party. *Id.* at 248–49.  The Court must grant summary judgment against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.  Properly applied, Rule 56 will "isolate and dispose of factually unsupported claims or defenses" before those issues come to trial. *Id.* at 323–24.

## III.     EVIDENCE CONSIDERED

Before addressing the substantive arguments raised by both parties, the Court must first determine what evidence is properly before it.  Federal Rule of Civil Procedure 56(c) provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support that assertion by: (a) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions,

interrogatory answers, or other materials."  If a party does not comply with Rule 56(c) by failing to properly address another party's assertion of fact, the court may consider the fact undisputed for purposes of the motion or otherwise grant summary judgment.  Fed. R. Civ. P. 56(e)(2)–(3).

Plaintiff's brief is replete with instances in which no citation is made to the evidentiary record before the Court.  Moreover, in order to fill the apparent evidentiary gaps in the record, Plaintiff has submitted to the Court a "certification in lieu of affidavit."  *See* (Passannante Cert., Ex. A).  For many of the propositions that Plaintiff seeks to establish, she cites only to this certification.  This certification, however, is not evidence.  Noticeably, none of these assertions are made under oath or declared to be true under penalty of perjury.  An unsworn certification such as this, which is not supported by any documentary or testimonial evidence, is plainly insufficient to defeat summary judgment.  *See, e.g.*, *Byrne v. Monmouth Cnty. Dep't of Health Care Facilities*, 372 F. App'x 232, 234 (3d Cir. 2010); *see also* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, *set out facts that would be admissible in evidence*, and show that the affiant or declarant is competent to testify on the matters stated." (emphasis added)); Fed. R. Civ. P. 56(e). Therefore, the Court will not consider any allegation stated in this certification as established for the purposes of creating a factual dispute.  Similarly, where Plaintiff fails to cite to a portion of the record the Court considers this factual assertion as unsupported by any evidence or, if the factual assertion is made in rebuttal to one of Defendants' assertions, the Court considers Defendants' assertion to be admitted by Plaintiff.

## IV.    ANALYSIS

Four counts remain in this case.  These counts include claims arising under the FMLA, the CEPA, the LAD, and the Wage Act.  After reviewing the factual record in this case, the Court has determined that judgment should be entered in favor of Defendants on Plaintiff's

FMLA and CEPA claims.   Plaintiff's LAD and Wage Act claims present a sufficient factual dispute to proceed to trial.  Plaintiff's Wage Act claim, however, will be restricted to only those wages allegedly not paid to Plaintiff for commissions earned during the month of January 2010. The Court will address each of these claims in turn.

A.  Family Medical Leave Act

The FMLA was promulgated by Congress in 1993 to promote "the important societal interest in assisting families by establishing a minimum labor standard for leave."  *Churchill v. Star Enters.*, 183 F.3d 184, 192 (3d Cir. 1999).  To that end, Congress prohibited certain employment practices, including, *inter alia*, making it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made lawful" by the FMLA.  29 U.S.C. § 2615(a)(2).  For example, "[a]n employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave."  29 C.F.R. § 825.220(c).  A claim arising under § 2615(a)(2) is referred to as a "retaliation" claim. *See Callison v. City of Phila.*, 430 F.3d 117, 119 (3d Cir. 2005).  Plaintiff alleges Defendants retaliated against her by "substantially reducing Plaintiff's responsibilities, severely cutting her compensation, and constructively discharging Plaintiff from her employment after taking time off for her own 'serious health condition.'"  (Am. Compl. ¶ 53).

In order to succeed on a retaliation claim, a plaintiff must prove that (1) she invoked her right to FMLA benefits, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to her invocation of her rights.  *Hayduk v. City of Johnstown*, 386 F. App'x 55, 59–60 (3d Cir. 2010) (citing *Erdman v. Nationwide Ins. Co.*, 582 F.3d at 509; *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 146 (3d Cir. 2004)).  Causation may be established through evidence relating to the timing of the discharge and through evidence of ongoing antagonism.  *See, e.g.*, *Abramson v. William Patterson College of N.J.*, 260 F.3d 265,

288 (3d Cir. 2001).  When a plaintiff relies on "indirect" evidence,[2] such as the timing of the adverse employment decision, in order to establish her claim, the familiar *McDonnell Douglas* burden-shifting scheme is applicable in analyzing whether the FMLA has been violated.  *See Spring v. Sealed Air Corp.*, No. 11-3828, 2012 U.S. App. LEXIS 10784, at *9–10 (3d Cir. May 29, 2012) (citing *Atchison v. Sears*, 666 F. Supp. 2d 477, 490 (E.D. Pa. 2009)).

Under the burden-shifting framework applicable to FMLA claims, a plaintiff must first present a prima facie case of retaliation.  *See Naber v. Dover Healthcare Assocs.*, No. 11-1769, 2012 U.S. App. LEXIS 6559, at *5 (3d Cir. Apr. 2, 2012).  Once a plaintiff has established a prima facie case of retaliatory discrimination "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action."  *Id.* (quoting *Bearley v. Friendly Ice Cream Corp.*, 322 F. Supp. 2d 563, 571 (M.D. Pa. 2004); *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).  If a defendant meets this burden, the burden then shifts back to the plaintiff, who must prove that the employer's proffered reason for the adverse employment decision was pretextual.  *See id.* (citing *Baltuskonis v. US Airways, Inc.*, 60 F. Supp. 2d 445, 448 (E.D. Pa. 1999); *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d Cir. 1996)).

Plaintiff's FMLA claim is based on the theory that after Plaintiff requested FMLA leave on November 5, 2009, Lang sent Plaintiff an email that changed the scope of Plaintiff's responsibilities such that she would thereafter be responsible only for international sales.  *See* (Hart Decl., Ex. 19).  This decrease in employment responsibility and compensation, Plaintiff alleges, was an adverse employment decision caused by Plaintiff's FMLA leave.  Furthermore, this change made Plaintiff's work conditions so intolerable that it resulted in a "constructive

---

[2]  A different situation arises when a Plaintiff relies on "direct evidence."  "'Direct evidence' means evidence sufficient to allow the jury to find that 'the decision makers placed substantial negative reliance on the protected activity in reaching their decision' to fire him."  *Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 (3d Cir. 2002) (quoting *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir. 1998)).

termination" of Plaintiff's employment.  Defendants, on the other hand, argue that the facts

unequivocally show that Plaintiff requested FMLA leave on November 9, 2009, which was to be

made retro-active to November 5, 2009.  Because of this, Defendants contend, Plaintiff cannot

establish causation between Plaintiff's request for FMLA leave and her subsequent reduction in

responsibility and compensation.  Furthermore, because the reduction in responsibility and

compensation are not causally related to Plaintiff's FMLA leave, these same changes cannot

serve a basis for Plaintiff's claim of constructive termination.

### 1. *When Did Plaintiff Request FMLA Leave?*

As noted above, *see supra* Part II, Federal Rule of Civil Procedure 56(c) provides that a

party asserting that a fact is genuinely disputed must cite to particular parts of the record.  Here,

Plaintiff has failed to properly cite to any facts rebutting the evidence submitted by the

Defendants.  Therefore, because Plaintiff has no evidentiary support for its position, no

reasonable juror could find that Plaintiff requested FMLA leave on November 5, 2009.

Defendants have presented sufficient evidence that a finder of fact could rely on to

conclude that Plaintiff did not request FMLA leave until November 9, 2009.  First, the FMLA

application itself states that Plaintiff did not request leave until that date.  *See* (Hart Decl., Ex.

20).  Second, Dawn Elias, the employee in charge of human resources for Mon Cheri, testified in

deposition that Plaintiff did not request leave until November 9th and that Plaintiff requested that

she back date her FMLA leave to start on November 5th.  (Hart Decl., Ex. 29, 37:16–41:25).

Moreover, Ms. Elias testified that Plaintiff could not have possibly spoken with her about FMLA

leave on November 5th because Ms. Elias was on vacation that day and she was not in the office

working.  *See* (*id.* 55:20–56:7); *see also* (Hart. Decl. II, Ex. 4).  Lang similarly testified that he

had no knowledge that Plaintiff requested FMLA leave at the time he authored the memorandum

sent to Plaintiff on November 5, 2009.  (Hart Decl., Ex. 28, 105:8–12).

In response to these facts, Plaintiff cites only to her "certification in lieu of affidavit" that she executed for purposes of this motion. *See* (Pl.'s Statement of Material Facts ¶ 30). Even ignoring for the moment the fatal issue of whether an unsworn certification has sufficient evidentiary worth for a court to consider it in deciding a motion for summary judgment (it does not),[3] nowhere in this certification does it state that Plaintiff requested leave on November 5, 2009. *See* (Passannante Cert., Ex. A). In opposing a motion for summary judgment, the nonmoving party "may not rely merely on allegations or denials" contained in its brief. *Celotex Corp.*, 477 U.S. at 325. Because Plaintiff has presented no evidence of its own to rebut the evidence submitted by Defendants, no reasonable jury could find that Plaintiff requested FMLA leave on November 5, 2009. As a result, Plaintiff is unable to present a prima facie case of an FMLA violation because there is no evidence of causation. Any adverse employment action occurring prior to November 9, 2009, the date that Plaintiff requested FMLA leave, could not have been caused by Plaintiff's leave of absence.[4] Therefore, to the extent that Plaintiff's FMLA claim is based on the email sent by Lang on November 5, 2009, the Court will enter judgment in favor of the Defendants.

---

[3] *See supra* Part II.
[4] Plaintiff has attempted to salvage this claim in a sur-reply letter, which was faxed to the Court and never placed onto the electronic filing system. In that letter, Plaintiff claims to be supplementing her answers to interrogatories and her responses to a notice to produce. Attached to that letter is what appears to be page 16 of 18 of Plaintiff's phone bill indicating the calls that were made by Plaintiff on November 4th and 5th. Allegedly, two of the numbers on this phone bill belong to Mon Cheri and Ms. Elias. This allegedly corroborates Plaintiff's claims. The letter and its attached "exhibits," however, fail to comply with numerous Local Rules. *See, e.g.*, Local Civ. R. 5.1(b) (proof of service on opposing party required for all papers required to be served); Local Civ. R. 7.1(b)(2) (all papers in support of motion must be filed electronically with clerk); Local Civ. R. 7.1(d)(6) (no sur-replies permitted without permission of the Judge). Moreover, although a party has a continuing obligation to supplement discovery requests, *see* Fed. R. Civ. P. 26(e)(1), this document has presumably been in Plaintiff's possession for some time and it was never produced in discovery. Discovery has long since closed and Plaintiff has produced this only in the face of a dispositive motion. Lastly, the documents attached to Plaintiff's letter were not properly authenticated. For all of these reasons, the Court will not consider its contents.

2. *Was Plaintiff "Constructively Terminated" Because of Her FMLA Leave?*

Although the decrease in Plaintiff's responsibilities and compensation occurred prior to Plaintiff's request for FMLA leave, the alleged "constructive termination" did not occur until January of 2010. Therefore, the Court must separately address whether Plaintiff can make out a prima facie case for constructive termination as a result of her leave of absence.

Constructive termination occurs where working conditions are "so unpleasant or difficult that a reasonable person would have felt compelled to resign." *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 974 (3d Cir. 1998) (citing *Spangle v. Valley Forge Sewer Auth.*, 839 F.2d 171, 173 (3d Cir. 1988)). The test for determining whether these conditions exist is an objective one—i.e., "the conditions must have been objectively 'intolerable.'" *Kiburz v. England*, 361 F. App'x 326, 337 n.11 (3d Cir. 2010) (citing *Spangle*, 839 F.2d at 173). This is a high standard that "requires a showing that a reasonable person in the employee's position would feel like she had 'no choice but to resign.'" *Id.*

> "Intolerability" is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign; presumably every resignation occurs because the employee believes that it is in his best interest to resign. Rather, "intolerability is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt *compelled* to resign,"—that is, whether he would have had no choice but to resign.

*Connors*, 160 F.3d at 976 (quoting *Blistein v. St. John's College*, 74 F.3d 1459, 1468 (4th Cir. 1996)).

Having concluded that no reasonable juror could find that the changes made in Plaintiff's employment status prior to November 9, 2009 could have been caused by Plaintiff's FMLA leave, the Court similarly concludes that Plaintiff was not constructively terminated as a result of her FMLA leave as a matter of law. Plaintiff's claim for constructive termination hinges on the

fact that her work responsibilities were cut and her compensation decreased.  Only conditions

resulting after November 9, 2009, however, may be attributed to Plaintiff's FMLA leave.

Although there were email exchanges between Plaintiff and Lang after November 9, 2009

indicating a strained relationship, *see, e.g.*, (Passannante Cert., Ex. B, P477), there is nothing to

suggest that the tone of these emails differed from the period prior to Plaintiff taking FMLA

leave.  Nothing in the evidentiary record before the Court indicates that a material change in the

Plaintiff's work conditions occurred after the November 9th request for leave.  Thus, Plaintiff has

failed to establish a prima facie case of retaliatory constructive discharge because she cannot

prove that that her working conditions were caused by her leave of absence.  No reasonable jury

could find otherwise.  Therefore, judgment will be entered in favor of Defendants on Plaintiff's

FMLA count.

### B.  Conscientious Employee Protection Act

Plaintiff's next claim arises out of her belief in February of 2008 that Lang was

misappropriating Mon Cheri assets.  This claim is brought pursuant to N.J.S.A. 34:19-3, New

Jersey's CEPA statute.  CEPA is a remedial whistle-blower statute meant to "protect employees

who report illegal or unethical work-place activities." *Barratt v. Cushman & Wakefield of New

Jersey, Inc.*, 675 A.2d 1094, 1098 (N.J. 1996).  Because CEPA is remedial in nature, it should be

construed liberally so as to achieve its purpose.  *Id.*  In order to succeed on a CEPA claim a

plaintiff must establish: (1) she reasonably believed illegal conduct was occurring; (2) she either

(a) disclosed or threatened to disclose the activity to a supervisor or public body or (b) objected

to or refused to participate in the illegal conduct; (3) retaliatory action was taken against her; and

(4) there was a causal connection between the whistleblowing and the adverse employment

action. *See Blackburn v. UPS, Inc.*, 179 F.3d 81, 92 (3d Cir. 1999) (quoting *Kolb v. Burns*, 727

A.2d 525, 530 (N.J. Super. Ct. App. Div. 1999)); *see also Costello v. City of Brigantine*, No. 99-

11

4072, 2001 U.S. Dist. LEXIS 8687, at *31 (D.N.J. June 28, 2001) (citing N.J.S.A. 34:19-3(c);

*Kadetsky v. Egg Harbor Twp. Bd. of Educ.*, 82 F. Supp. 2d 327, 340 (D.N.J. 2000)). When a

plaintiff's CEPA claims rely on circumstantial evidence, as here, the *McDonnell Douglas* burden

shifting scheme discussed above[5] applies. *See Blackburn*, 179 F.3d at 92 (citing *Velantzas v.*

*Colgate-Palmolive Co.*, 536 A.2d 237, 238 n.1 (N.J. 1988); *Kolb*, 727 A.2d at 530-31)); *see also*

*Bocobo v. Radiology Consultants of S. Jersey, P.A.*, No. 07-3142, 2012 U.S. App. LEXIS 7642

(3d Cir. Apr. 17, 2012) (citing *Fleming v. Corr. Healthcare Solutions, Inc.*, 751 A.2d 1035, 1041

(N.J. 2000)).

 Defendants contend, among other things, that Plaintiff has not established a prima facie

case under the CEPA because any adverse employment action that occurred in this case occurred

only after a lengthy delay from Plaintiff's alleged whistle-blowing. Defendants further argue

that even assuming that Plaintiff can present a prima facie case, Plaintiff is unable to present

evidence rebutting Mon Cheri's legitimate, non-discriminatory reasons for its actions. The Court

agrees with both of these arguments and finds that no reasonable juror could conclude otherwise.

 Temporal proximity between the whistle-blowing and the alleged adverse employment

action by the employer is often used as circumstantial evidence of an employer's motivation.

*See Bocobo*, 2012 U.S. App. LEXIS 7642, at *25 (citing *Kachmar v. SunGard Data Sys.*, 109

F.3d 173, 177 (3d Cir. 1997)). Temporal proximity alone, however, is insufficient to establish

causation under the CEPA. *See Hancock v. Borough of Oaklyn*, 790 A.2d 186, 194 (N.J. Super.

Ct. App. Div. 2002) (citing *Bowles v. City of Camden*, 993 F. Supp. 255, 263–64 (D.N.J.1998)).

Plaintiff alleges numerous adverse employment actions that resulted from her complaints to

Krishnaswami concerning Lang's misappropriation of funds. Many of these alleged adverse

actions, however, are unsupported by evidence properly before the Court. *See supra* Part II.

---

[5] *See supra* Part IV.A.

Indeed, the only adverse employment action that the Court can glean from the evidence on record is Plaintiff's alleged constructive termination in January of 2010 or the decrease in Plaintiff's responsibilities and compensation in November of 2009.  The temporal proximity between the Plaintiff's whistle-blowing and any adverse employment action, however, is too remote to afford Plaintiff an inference of causation.  Cases in which courts have permitted temporal proximity to serve as evidence of causation have presented much shorter lengths of time between the whistle-blowing and the alleged adverse employment action.  *Compare Caver v. City of Trenton*, 420 F.3d 243, 249 (3d Cir. 2005) (within six months); *Schlictig v. Inacom Corp.*, 271 F. Supp. 2d 597, 613 (D.N.J. 2003) (two weeks); *see also Smith v. Twp. of E. Greenwich*, 344 F. App'x 740, 749 (3d Cir. 2009) (whistle-blowing occurring sometime between July and October 2004 and failure to promote sometime in 2005 insufficient to raise inference of causation).

Plaintiff also points to two instances of on-going antagonism.  First, in August of 2009, Plaintiff sent Lang an email that stated in pertinent part, "It seems like your [sic] [i.e., Lang] cutting of [sic] my support including reps." (Passannante Cert., Ex. B, P455).  In a lengthy reply email, though not directly in response to Plaintiff's claim about her cut-off support system, Lang states: "You have chosen to ignore my comments about the complaining you and Walter have voiced to [Krishnaswami].  Guess what, [Krishnaswami] trusts my judgment more than yours or Walt's, and your end-runs do not impress him nor me." (*Id.*, P454).  Second, Plaintiff points to, without citation to the record, a November 2009 email in which Lang states, "You went to [Krishnaswami] with fairytales."  Conditions became so bad for Plaintiff, she claims, that in January of 2010 she was eventually forced to leave.  The Court does not believe that this is sufficient evidence that a reasonable juror could rely on in determining that Plaintiff's whistle-blowing caused an adverse employment action.

13

Assuming *arguendo* that Plaintiff's evidence of on-going antagonism is sufficient to make a prima facie case of causation, however, Defendants have presented ample evidence of legitimate, non-discriminatory reasons for their actions toward Plaintiff.  A series of emails from February 21, 2007 (roughly a full year before the events giving rise to Plaintiff's CEPA claims) through the November 5, 2009 email that reduced Plaintiff's responsibilities and compensation reveal numerous performance related issues with Plaintiff.  *See* (Hart. Decl., Exs. 8, 9, 12, 14, 15, 16).  These emails reveal: a long history of Plaintiff bumping heads with employees that she managed, as well as other managers; consistent absences from work (unrelated to her FMLA leave); several attempts to leave Mon Cheri in order to compete against it; and other problems with her employment.

The Defendants having supplied evidence of legitimate, non-discriminatory reasons for their actions taken toward Plaintiff, the burden then shifts back to Plaintiff to show that there is a genuine issue for trial.  *Blackburn*, 179 F.3d at 94 (citing Fed. R. Civ. P. 56).  Plaintiff has presented no evidence to show that the Defendants' reasoning was merely pretextual; nothing indicates that Defendants' reasoning was "implausible, inconsistent, incoherent, or contradictory."  *Bocobo*, 2012 U.S. App. LEXIS 7642, at *23; *see also Blackburn*, 179 F.3d at 103; *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).   Because Plaintiff has not met its burden in presenting evidence of pretext, no reasonable juror could find in her favor.  Accordingly, judgment will be entered on Plaintiff's CEPA claim in favor of the Defendants.

### C.  Law Against Discrimination

Plaintiff's next claim arises under New Jersey's LAD, N.J.S.A. 10:5-1, *et seq.*  Carita alleges that she was discriminated against based upon her sex and that this discrimination resulted in a hostile work environment.  More specifically, Plaintiff claims that the sales team reorganization in February 2007 was done to Plaintiff's detriment and to Egitto's benefit.  Egitto

14

is a male employee[6] of Mon Cheri, whose principal responsibility is to provide sales support and management.  Egitto was allegedly given resources and tools that Plaintiff did not have the benefit of and was otherwise placed in a position to earn higher commissions than Plaintiff. Defendants contend, among other things, that Plaintiff and Egitto were not similarly situated and that Defendants had a legitimate, non-discriminatory reason for treating Egitto differently.

The LAD provides that it shall be unlawful "[f]or an employer, because of the . . . sex . . . of any individual . . . to discriminate against any individual in compensation or in terms, conditions or privileges of employment."  N.J.S.A. 10:5-12.  Gender discrimination claims brought under the LAD are generally analyzed in the same way as claims arising under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. 2000e-2, *et seq.*, the federal counter-part to the LAD.  *See, e.g.*, *Bergen Commercial Bank v. Sisler*, 723 A.2d 944, 949 (N.J. 1999) (citations omitted).  As such, New Jersey courts have adopted the *McDonnell Douglas* burden-shifting scheme for LAD claims.  *See Zive v. Stanley Roberts, Inc.,* 867 A.2d 1133, 1139 (N.J. 2005).  "The plaintiff carries the initial burden of establishing a prima facie case, and although the prima facie elements of a discrimination claim vary depending on the particular facts of the case, the plaintiff's task generally is to raise an inference of discrimination."  *Vulcan Pioneers v. City of Newark*, 374 F. App'x 313, 318 (3d Cir. 2010) (citations and internal quotations omitted); *see also Kelly v. Bally's Grand, Inc.*, 667 A.2d 355 (N.J. Super. Ct. App. Div. 1995).

In a situation such as this, where a female employee claims sex-discrimination based on wage disparity or having access to less favorable resources, courts have often defined a prima facie case "in relatively broad terms."  *Grigoletti v. Ortho Pharm. Corp.*, 570 A.2d 903, 909 (N.J. 1990).  To establish a prima facie case a plaintiff must prove: (1) that they are a member of

---

[6] The parties dispute whether Egitto is an employee or an independent contractor of Mon Cheri.  The Court does not decide this issue at this time.

15

a protected class; (2) that they were paid less than or treated less favorably than a counterpart of the opposite sex; and (3) that the plaintiff and her male counterpart had similar jobs.[7] *See generally id.* ("If establishing a prima facie case means anything at all in a . . . sex-based wage compensation case, the plaintiffs' jobs must be similar in some respect to the group who allegedly received favorable treatment because of their sex." (internal quotations omitted)). Establishing these elements, however, is not an onerous task. *Id.* (quoting *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 986 (1988)).

The Court is satisfied after reviewing the evidence submitted by both parties that, at the very least, there is a material question of fact as to whether Plaintiff has presented a prima facie case of sex discrimination sufficient to send this case to trial. For example, Plaintiff has submitted evidence that when she used representatives from other sales groups she would not receive a commission on that sale. Egitto, on the other hand, was able to use representatives from other sales groups and receive a commission on those sales. (Passannante Cert., Ex. D, 86:15–88:12). This is sufficient to establish the second element of Plaintiff's prima facie case. Defendants argue that Egitto was an independent contractor and therefore he and Plaintiff did not have similar jobs. *See* (Hart Decl. II, Ex. 1). At the same time, however, Egitto was paid what Lang has referred to as a "salary" and was offered health benefits. (Passannante Cert., Ex. E, P587). Moreover, both Plaintiff and Egitto were considered sales managers, whose main duties involved selling Mon Cheri product lines. This is sufficient to create a material question of fact for trial as to the third element of Plaintiff's prima facie case.

Defendants next argue that—even assuming Plaintiff has presented a prima facie case— Mon Cheri had a legitimate, non-discriminatory reason for promoting Egitto. Defendants claim

---

[7] The parties have each suggested their own four-part prima facie test applicable to this case. The Court does not believe, however, that either of the tests suggested by the parties is appropriate on the facts presented.

that Egitto was promoted due to his strong performance and his ability to grow revenue. Although this may have been a legitimate and non-discriminatory reason for promoting Egitto, it fails to explain why, once promoted, Egitto was given preferential treatment.  Under the *McDonnell Douglas* burden shifting scheme, Defendants must come forward with some evidence to establish this alleged legitimate, non-discriminatory reasoning.  The only evidence cited to support Defendants position is five lines of transcript from Lang's deposition testimony.  *See* (Defs.' Br. at 29).  In his deposition, Lang testified as follows: "Q. Was [Egitto's promotion] accompanied by the opportunity for increased commissions? A. If he grew the business.  Q. And has he grown the business?  A. Dramatically."  (Hart. Decl., Ex. 28, 61:23–62:2).  This evidence speaks only to Egitto's ability to grow business *after* he was promoted, not to the Defendants' reasoning *before* the actual promotion.  In other words, this evidence provides only an *ad hoc* justification for Egitto's promotion.  This is insufficient to rebut Plaintiff's prima facie case.

For these reasons it appears to the Court that a disputed question of fact remains as to whether Plaintiff can prevail.  Accordingly, summary judgment will not be entered in favor of the Defendants on Plaintiff's sex discrimination claim.

    D.  <u>Wage and Hours Law</u>

Lastly, Plaintiff claims that Mon Cheri violated the New Jersey Wage Act, N.J.S.A. 34:11-4.1, *et seq.*, by allegedly failing to pay commissions to Plaintiff that she earned prior to her termination.  Defendants argue that Plaintiff cannot prevail on her claim as a matter law because the payments in dispute are not "wages" as defined under the Wage Act and that any wages "earned" after the end of Plaintiff's employment are not actionable under the Wage Act because Plaintiff was an at-will employee.  Although the Court has determined that the payments at issue are in fact "wages" as defined under the Wage Act, and that Plaintiff's Wage Act claim should

be allowed to proceed to trial, this claim will be restricted to only those commissions earned by Plaintiff in the month of January 2010.

The Wage Act was enacted "to allow a private right of action (a civil action) for a violation thereof to the employee against the employer and its managing officers for wages not paid as provided therein." *Mulford v. Computer Leasing, Inc.*, 759 A.2d 887 (N.J. Super. Ct. Law Div. 1999) (citation omitted).  The Wage Act provides, in relevant part, that when an employee separates from his or her employer for any reason, "the employer shall pay the employee all wages due not later than the regular payday for the pay period during which the employee's termination, suspension or cessation of employment (whether temporary or permanent) took place," and that "in the case of employees compensated in part or in full by an incentive system, a reasonable approximation of all wages due [must be paid], until the exact amounts due can be computed."  N.J.S.A. 34:11-3.  As a sales manager, Plaintiff received "performance overrides" in which she was paid a percentage of sales made by sales people working under her direction.  *See* (Hart Decl., Ex. 28, 47:12–50:5).  The parties often referred to these as "commissions."  Defendants posit that these overrides were "supplementary incentives" not covered under the Wage Act.  Thus the Court is presented with a pure question of law—i.e., whether these "performance overrides" can appropriately be considered commissions or whether they are to be considered "supplementary incentives."

As an initial matter, the parties dispute what definition of wages should be applied. Plaintiff cites to N.J.S.A. 34:11-57 for the definition of "wages" that should be applied in this case.  The definition offered by Plaintiff refers to a portion of New Jersey's wage laws dealing with the Commissioner of Labor and Industry; it does not apply to private lawsuits.  Defendants, on the other hand, cite to cases interpreting the definition of wages found under N.J.S.A. 34:11-4.  Under this provision wages are defined as: "the direct monetary compensation for labor or

services rendered by an employee, where the amount is determined on a time, task, piece, or commission basis excluding any form of supplementary incentives and bonuses which are calculated independently of regular wages and paid in addition thereto." It appears to the Court that the correct definition of "wages" to be applied in this case is the definition offered by Defendants.

The Wage Act is remedial legislation and therefore it should be given a broad construction. *See N.J. Dep't of Labor v. Pepsi-Cola Co.*, 784 A.2d 64 (N.J. 2001) (citing *Yellow Cab Co. v. State*, 312 A.2d 870, 873 (N.J. Super. Ct. App.Div.1973)). Moreover, exceptions should be narrowly construed. *Id.* The burden of proving that an exemption applies should be imposed on the employer. *See Yellow Cab Co.*, 312 A.2d at 873 (citation omitted). Despite the fact that an employer and an employee may refer to certain payments as a "commission," this is not dispositive. *See Sluka v. Landau Uniforms, Inc.*, 383 F. Supp. 2d 649, 656 (D.N.J. 2005) (finding that payments were not commissions as defined under the Wage Act despite being called a commission in the employment contract). Rather, the Court should look to the purpose of the payment.

In *Sluka*, another court in this district briefly addressed whether certain payments could properly be considered a "commission" or whether those payments constituted a "supplementary incentive." Following his termination, the plaintiff in *Sluka* was paid his base salary and a 1% net commission on sales that he made before the end of his employment. In addition to this 1% net commission, however, plaintiff claimed that his former employer never paid him two payments that he was generally entitled to: first, for a year-over-year increase in sales; and second, a 2% net commission for sales made to new customers the plaintiff brought to the company in the previous year. The court concluded that these additional payments were "supplementary incentives" and therefore exempt under the Wage Act. Defendants allege that

19

this case is dispositive of Plaintiff's Wage Act claim.  The facts in this case, however, are considerably different than those of *Sulka*.

According to Lang's own testimony, the overrides Plaintiff earned "really were salary for managing the people that were under her charge."  (Hart Decl., Ex. 28, 47:19–48:5).  Further, the total amount Plaintiff was owed was based on a percentage of total sales.  (*Id.* 48:6–8).  Unlike the payments at issue in *Sulka*, the overrides that Carita allegedly earned were consistent on all sales.  In contrast, the payments disputed by the plaintiff in *Sulka* were meant to encourage employees to find new customers by providing an incentive *above and beyond* the incentives provided by the plaintiff's normal commission for his sales to existing customers.  Because of this difference, the Court does not believe that these payments can properly be characterized as a "supplementary incentive."

Although Plaintiff has sufficiently alleged a Wage Act claim, this claim is very limited. In her briefing, Plaintiff alleges that she is entitled to override payments for sales that were booked prior to Plaintiff's departure but that were not shipped until after her departure.  As discussed above, *see supra* Part II, there is absolutely no evidence of this before the Court. Plaintiff admitted during her deposition that she was paid commissions through the month of December 2009.  (Hart Decl., Ex. 27, II, 11:10–12).  Plaintiff claims commissions are owed to her from January 2010 through January 2011.  (*Id.* 11:13–15).  In January of 2010, however, Plaintiff ended her employment with Mon Cheri.  Moreover, Plaintiff was an at-will employee and has cited to no applicable law indicating that an at-will employee is entitled to wages or commissions after termination or resignation of employment.  Therefore, Plaintiff's Wage Act claim will be limited to the overrides that she earned during the time from the end of the December 2009 pay period through the end of her employment at Mon Cheri.

## V.      CONCLUSION

For the foregoing reasons, judgment will be entered in favor of the Defendants on

Plaintiff's FMLA and CEPA claims, but Plaintiff's LAD and Wage Act claims will proceed to

trial.  An appropriate Order will follow.


                                                        _/s/ Anne E. Thompson_____
                                                        ANNE E. THOMPSON, U.S.D.J.


Date: June 22, 2012